**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| Carlotta Motsinger, | ) | Civil Action No. 4:11-01734-JMC |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW,** |
| Nationwide Mutual Insurance Company, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The instant matter is before the court pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. Specifically, Defendant Nationwide Mutual Insurance Company ("Nationwide") filed a counterclaim to Plaintiff Carlotta Motsinger's ("Motsinger") claims for insurance bad faith, breach of contract accompanied by a fraudulent act, and abuse of process, seeking a declaration that Motsinger cannot stack her underinsured coverages under her Nationwide policies because she is not a Class I insured. (ECF No. 57.) The parties agreed to proceed with a bench trial on Nationwide's declaratory judgment counterclaim prior to proceeding with a jury trial on Motsinger's claims against Nationwide. (See ECF No. 115.)

The court conducted the aforementioned bench trial on November 12, 2013. (See ECF No. 147.) At the conclusion of the parties' presentations, Motsinger moved for directed verdict, which motion the court took under advisement. (ECF Nos. 148, 149.) After carefully considering all testimony, exhibits, and arguments of counsel presented at the bench trial of this matter, and taking into account the credibility and accuracy of the evidence, and in consideration of the applicable law, the court concludes that Motsinger does not qualify as a Class I insured. Therefore, Motsinger may not "stack" her underinsured motorist coverage as she has failed to establish by a preponderance of the evidence that she was the common law spouse of William

1

Workman ("Workman") on November 10, 2008, the date Motsinger was injured in an automobile accident. Accordingly, Motsinger's motion for directed verdict is **DENIED**.

In support of this conclusion, the court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52[1]:

## **FINDINGS OF FACT**

The Parties

    1.    Motsinger is a resident of Horry County, South Carolina. (ECF No. 56 at 1 ¶ 1.)

    2.    Nationwide is a corporation organized under the laws of the State of Ohio and is qualified to do business in South Carolina and maintains agents and servants in the State of South Carolina for the purposes of carrying out business. (ECF No. 56 at 1 ¶¶ 2, 3; ECF No. 57 at 1 ¶¶ 3, 4.)

Insurance Policies at Issue

    3.    Nationwide provides automobile insurance to Motsinger under policy number 61 39 K 808483. (Def.'s Bench Trial Exs. 8, 9.) Three vehicles are covered under this policy. (Id.)

    4.    Nationwide also provides automobile coverage to Motsinger under policy number 61 39 M 030427. (Def.'s Bench Trial Ex. 9.) One vehicle is covered under this policy. (Id.)

    5.    Both of the above-mentioned Nationwide insurance policies carry policy limits of $25,000.00 per person and $50,000.00 per occurrence in liability coverage and $25,000.00 per person and $50,000.00 per occurrence in underinsured motorist ("UIM") coverage. (Def.'s Bench Trial Exs. 8, 9.)

---

[1] Fed. R. Civ. P. 52 requires that "[i]n an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). To the extent any findings of fact constitute conclusions of law, they are adopted as such; to the extent any conclusions of law constitute findings of fact, they are so adopted.

Facts Pertinent to the Determination of Motsinger's Insured Status

      6.     Motsinger testified that she had been married twice before meeting Workman and she obtained marriage licenses in both of her prior marriages. (Motsinger Bench Trial Test.[2]) Motsinger further testified that she divorced her second husband, Randall Motsinger, on December 19, 2003. (Id.)

      7.     Motsinger testified that she purchased a home at 4365 Bay Berry Drive, Little River, South Carolina in June of 2004. (Motsinger Bench Trial Test.)

      8.     Motsinger testified that she met Workman in November of 2006. (Motsinger Bench Trial Test.)

      9.     Motsinger testified that in early 2007, Workman moved into her residence at 4365 Bayberry Drive, Little River, South Carolina. (Motsinger Bench Trial Test.) Motsinger testified that she did not view Workman as a tenant on her property. (Id.) Motsinger further testified that she has not lived separately from Workman since he moved into her home. (Id.) Workman testified that he has lived with Motsinger since moving into her home in May or June of 2007. (Workman Bench Trial Test.)

      10.    Motsinger testified that on November 9, 2007, she and Workman reached an agreement to consider themselves married, which agreement included an exchange of rings. (Motsinger Bench Trial Test.) Workman testified that he and Motsinger decided that, since their relationship was going so well, they should go ahead and consider themselves married and enjoy each other for the rest of their lives. (Workman Bench Trial Test.) Workman further testified that he and Motsinger exchanged wedding rings on November 9, 2007, not engagement rings.

---

[2] For purposes of this order, the court used a preliminary draft of the transcript from the November 12, 2013 bench trial. As a result, the order does not cite to specific pages from the transcript to avoid inaccurate citation.

(Id.)

11.     Motsinger testified that she and Workman did not consider applying for a marriage license in South Carolina or any other state.  (Motsinger Bench Trial Test.)  Motsinger testified that she thought the act of obtaining a marriage license was cold and impersonal and she wanted a more personal ceremony instead of being married in front of a judge and two witnesses.  (Id.)

12.     Motsinger testified that she and Workman memorialized their agreement to be married at a Bonefish Grill restaurant in front of Motsinger's children and grandchild on November 16, 2007.  (Motsinger Bench Trial Test.)  Motsinger offered into evidence photographs of the November 16, 2007 event at Bonefish Grill.  (Pl.'s Bench Trial Exs. 2, 3, 4, 5, 6.)  The photographs show Workman presenting a second ring to Motsinger and Workman wearing a ring on his left hand on the finger customarily reserved for wedding rings.  (Id.)  Motsinger and Workman both testified that they consider November 16 to be their anniversary date.  (Motsinger Bench Trial Test; Workman Bench Trial Test.)  Motsinger further testified that she has worn her rings continuously since receiving them from Workman.  (Id.)

13.     After the November 16, 2007 event, Motsinger testified that she and Workman introduced each other to other people as husband and wife.  (Id.)

14.     In early 2008, Motsinger filed a federal tax return for the 2007 tax year in which she chose "head of household" as her filing status.  (Def.'s Bench Trial Ex. 3.)  Motsinger testified that she chose the head of household filing status because she was concerned about whether the federal government would recognize her common law marriage to Workman.  (Motsinger Bench Trial Test.)

15.     In early 2008, Workman filed a federal tax return for the 2007 tax year in which

his filing status was identified as "single." (Def.'s Bench Trial Ex. 6.) Motsinger prepared Workman's 2007 tax return. (Motsinger Bench Trial Test.; Workman Bench Trial Test.) Motsinger testified that she chose the single filing status for Workman because she was concerned about whether the federal government would recognize their common law marriage. (Motsinger Bench Trial Test.) Workman testified that he chose the single filing status on his tax return because not all agencies recognize common law marriage. (Workman Bench Trial Test.)

16.     On November 10, 2008, while Nationwide policy numbers 61 39 K 808483 and 61 39 M 030427 issued to Motsinger were in full force, Motsinger was injured in an automobile accident where she was a passenger in a vehicle owned and being driven by Workman. (Motsinger Bench Trial Test.; Def.'s Bench Trial Ex. 12; Workman Bench Trial Test.) As a result of the injuries sustained by Motsinger in the November 10, 2008 automobile accident, she sought treatment from various medical providers. (Id.)

17.     At the time of the accident on November 10, 2008, Motsinger testified that she and Workman did not jointly own any real or personal property. (Motsinger Bench Trial Test.) Their names did not appear jointly on any utility bills or financial accounts. (Id.) They did not have any joint bank accounts and did not have any children together. (Id.) Motsinger and Workman were not listed on each other's respective automobile insurance policies. (Def.'s Bench Trial Ex. 8.) Motsinger's Nationwide policies, in fact, showed that she was still married to Randall Motsinger on the date of the accident and that he was a named insured. (Id.) Motsinger testified that she had asked Nationwide to remove Randall Motsinger's name from her policy on many occasions. (Motsinger Bench Trial Test.)

18.     On the date of the accident, the emergency room records from Grand Strand Regional Medical Center show that Motsinger's marital status was identified as "single." (Def.'s

Bench Trial Ex. 13.)  Motsinger testified that she identified herself as single because some government agencies do not recognize common law marriage.  (Motsinger Bench Trial Test.)

19. On November 17, 2008, on a signed patient information form for Strand Orthopaedic Consultants, Motsinger stated that her marital status was "single" and left the section concerning spousal information blank.  (Def.'s Bench Trial Ex. 15.)  Motsinger testified that she did not identify Workman as her spouse because she was not sure that government agencies recognized common law marriage.  (Motsinger Bench Trial Test.)

20. On November 21, 2008, Motsinger entered Grand Strand Regional Medical Center for outpatient surgery on her wrist.  The patient information forms for Motsinger again identified her marital status as "single."  (Def.'s Bench Trial Ex. 14.)  Workman was listed as the "person to notify."  (Id.)  In the section of the form which asked what Workman's relationship to Motsinger was, the form states "Other Relationship."  (Id.)  The intervention activity forms for Grand Strand Regional Medical Center state that Motsinger was accompanied that day by her "fiancé" and that she was later discharged "home with fiancé and son."  (Def.'s Bench Trial Exs. 16, 17.)  Motsinger testified that she did not know how fiancé was placed on the intervention activity forms.  (Motsinger Bench Trial Test.)

21. On December 5, 2008, Motsinger again indicated on a patient information form for Strand Orthopaedic Consultants that her marital status was "single" and she further left the section concerning spousal information blank.  (Def.'s Bench Trial Ex. 21.)

22. On January 6, 2009, Motsinger stated on a patient information form for Progressive Physical Therapy that she was "engaged" and listed Workman as her fiancé.  (Def.'s Bench Trial Ex. 22.)

23. On February 9, 2009, Motsinger left the section of a patient information form for

6

Dr. Peter DeVito blank that requested information concerning Motsinger's spouse, indicating on the form that Workman was only the person to notify in case of an emergency. (Def.'s Bench Trial Ex. 24.)

24. In early 2009, Motsinger filed state and federal tax returns for the 2008 tax year in which she chose "head of household" as her filing status. (Def.'s Bench Trial Exs. 4, 5.) Motsinger testified that she chose head of household filing status because she was concerned about whether the federal government would recognize her common law marriage to Workman. (Motsinger Bench Trial Test.)

25. On the June 15, 2009 renewal of Motsinger's Nationwide policy numbered 61 39 K 808483, Workman is identified as an insured driver and as single. (Def.'s Bench Trial Ex. 26.) In addition, Randall Motsinger is identified as an insured driver and as married. (Id.)

26. In the latter part of 2009 approximately, Motsinger prepared a document to address challenges to her common law marriage with Workman. (Def.'s Bench Trial Ex. 11; Workman Bench Trial Test.) In pertinent part, the document provided that Motsinger and Workman "consider[ed] each other husband and wife, and although I do not have a specific date that we agreed to being husband and wife we have held each other out in public as a married couple several months after living together." (Def.'s Bench Trial Ex. 11.)

27. On November 13, 2009, Motsinger commenced an action against Workman in the Horry County (South Carolina) Family Court, seeking an order confirming that they were husband and wife and a common law marriage had existed between the parties since June 1, 2007. (ECF No. 151-3 at 8, 9.) Motsinger testified that she filed her family court action because her marriage was being questioned by her friends. (Motsinger Bench Trial Test.)

28. Workman testified that he was pretty sure that he and Motsinger filed joint tax

returns for the 2009 tax year in early 2010.  (Workman Bench Trial Test.)

29. On March 12, 2010, Motsinger and Workman mediated their family court case and reached settlement.  (ECF No. 151-3 at 57, 58.)  In their stipulation and settlement agreement, Motsinger and Workman declared that their common law marriage existed since on or about November 9, 2007.  (Id. at 61, 62.)

30. On September 2, 2010, the Horry County (South Carolina) Family Court entered a final order approving agreement, finding among other things that Motsinger and Workman were married by common law dating back to November 9, 2007.  (Id. at 72, 73.)

31. On February 10, 2011, the Horry County (South Carolina) Family Court vacated its September 2, 2010 final order approving agreement, finding that the court did not have subject matter jurisdiction over the Motsinger/Workman case because there was no justiciable or actual controversy.  (Id. at 135-140.)

32. In addition to the foregoing, the following witnesses presented testimony in support of Motsinger's contention that she was common law married to Workman on November 10, 2008:

a. Ernest Jeffrey Coe, a friend of Workman for approximately seven (7) years, testified on direct examination that Motsinger and Workman moved in together in the spring or summer of 2007.  (Coe Bench Trial Test.)  Coe further testified that he was aware of the ceremony on November 16, 2007 to announce the Motsinger/Workman marriage and their exchange of rings.  (Id.)  Moreover, after the ceremony, Coe testified that Workman called Motsinger his wife and Motsinger called Workman her husband.  (Id.)  Finally, Coe testified that there was not any doubt in his mind that Motsinger and Workman were married at the time of their automobile accident on November 10, 2008.  (Id.)

  b. Amy Miller Huffman, a friend of Motsinger for at least fourteen (14) years, testified that she perceived that Motsinger and Workman had been common law married since November 2007. (Huffman Bench Trial Test.) Huffman further testified that Motsinger and Workman referred to each other as husband and wife and wore wedding rings. (Id.) Huffman testified that she knew about the November 16, 2007 event at Bonefish Grill, but was not invited because Motsinger and Workman wanted the event to be private. (Id.) On cross-examination, Huffman denied earlier statements that she thought Motsinger and Workman got married when Workman moved into Motsinger's home. (Id. (citing Ct.'s Bench Trial Ex. No. 2).)

  c. Jeffrey L. Motsinger, Motsinger's twenty-nine (29) year old son, testified that Motsinger and Workman started living together in May of 2007. (J. Motsinger Bench Trial Test.) Jeffrey Motsinger testified that although Motsinger and Workman were already married, they had a marriage cerermony on November 16, 2007 at Bonefish Grill, which ceremony was attended by him, his sister (Candace Motsinger), and his nephew (LaTerrance). (Id.) Jeffrey Motsinger testified that he took the photographs that were introduced as Plaintiff's exhibits. (See Pl.'s Bench Trial Exs. 2-6.) Jeffrey Motsinger further testified that after November 16, 2007, Motsinger and Workman presented themselves as husband and wife and wore wedding rings. (Id.) Finally, Jeffrey Motsinger testified that he has considered Workman his stepfather since November 2007. (Id.) On cross-examination, Jeffrey Motsinger testified that Motsinger and Workman declared their intention to be married in June of 2007. (Id.)

  d. Jerry Michael Huffman, a friend of Motsinger for approximately eight (8) years through his wife, Amy Miller Huffman, testified that he learned about Motsinger and Workman's private wedding ceremony in November 2007 after the fact. (J. Huffman Bench Trial Test.) Jerry Huffman testified that after November 16, 2007, Motsinger and Workman did

9

present themselves as husband and wife and wore wedding rings, but he thought they were married earlier in 2007 when they moved in together. (Id.)

## CONCLUSIONS OF LAW

The Court's Jurisdiction and Nationwide's Standing

1. The Federal Declaratory Judgment Act provides that "in a case of actual controversy . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

2. Nationwide has standing to bring this action under the Federal Declaratory Judgment Act.[3]

3. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).[4]

Relevant Insurance Law

4. "It is the insured's burden to establish that a claim falls within the coverage of an insurance contract." Nationwide Mut. Ins. Co. v. Segura, C/A No. 6:05-CV-0806-HFF, 2007 WL 2791246, at *4 (D.S.C. Sept. 24, 2007) (citing Gamble v. Travelers Ins. Co., 160 S.E.2d 523, 525 (S.C. 1968)).

5. Motsinger seeks to stack the UIM coverage of the four vehicles insured by Nationwide under policy numbers 61 39 K 808483 and 61 39 M 030427. "Stacking refers to an insured's recovery of damages under more than one insurance policy in succession until all of his damages are satisfied or until the total limits of all policies have been exhausted." Nakatsu v.

---

[3] The court confirmed Nationwide's standing to bring this declaratory judgment action on the issue of whether Motsinger was a Class I insured in an order issued on January 30, 2013. (See ECF No. 81.)

[4] The court confirmed its subject matter jurisdiction to hear Nationwide's declaratory judgment action on the issue of whether Motsinger was a Class I insured in its January 30, 2013 order. (Id.)

Encompass Indem. Co., 700 S.E.2d 283, 286 (S.C. Ct. App. 2010) (quoting State Farm Mut. Auto. Ins. Co. v. Moorer, 496 S.E.2d 875, 883 (S.C. Ct. App. 1998)). "The critical question in determining whether an insured has the right to stack is whether he is a Class I or Class II insured. Concrete Servs., Inc. v. U.S. Fid. & Guar. Co., 498 S.E.2d 865, 866 (S.C. 1998) (citing Am. Sec. Ins. Co. v. Howard, 431 S.E.2d 604 (S.C. Ct. App. 1993)). "The two classes of insureds are: (1) the named insured, his spouse and relatives residing in his household; and (2) any person using, with the consent of the named insured, the motor vehicle to which the policy applies and a guest in the motor vehicle." Id. (citing Garris v. Cincinnati, 311 S.E.2d 723 (S.C. 1984)). "The right to stack is available only to a Class I insured." Id. (citing Fireman's Ins. Co. v. State Farm Mut. Auto. Ins. Co., 370 S.E.2d 85 (S.C. 1988); Ohio Cas. Ins. Co. v. Hill, 473 S.E.2d 843 (S.C. Ct. App. 1996)). In order to stack, it is only necessary that the insured qualify as a Class I insured as to the vehicle involved in the accident. Id. at 868.

6.    The standard of proof in a declaratory judgment action involving determination of whether a party is a Class I insured is a "preponderance of the evidence." See Floyd v. Nationwide Mut. Ins. Co., C/A No. 6:04-1305-GRA, 2006 WL 4730588, at *7 (D.S.C. May 17, 2006).

Relevant Law Regarding Common Law Marriage

7.    Motsinger contends that she was the common law spouse of Workman on the date of their accident. South Carolina has recognized common law marriage since at least 1832. See Fryer v. Fryer, 9 S.C. Eq. (Rich. Cas.) 85 (1832).

8.    Whether a common-law marriage exists is a question of law. Campbell v. Christian, 110 S.E.2d 1, 2 (S.C. 1959). The party seeking to establish the existence of a common law marriage carries the burden of proof. Ex parte Blizzard, 193 S.E. 633, 634 (S.C. 1937).

9. In South Carolina, the legality of common law marriage is codified at S.C. Code Ann. § 20-1-360, which provides that "[n]othing . . . shall render illegal any marriage contracted without the issuance of a license." Id.

10. In order for a common law marriage to occur, the parties must have the capacity to be married[5] and must have the present intent to enter into a marriage contract. Tarnowski v. Lieberman, 560 S.E.2d 438, 440 (S.C. Ct. App. 2002). An express contract is not always necessary as the intent to be married can be inferred from the circumstances. Kirby v. Kirby, 241 S.E.2d 415, 416 (S.C. 1978).

11. It is essential to a common law marriage that a mutual agreement exists between the parties to assume toward each other the relationship of husband and wife. Johnson v. Johnson, 112 S.E.2d 647, 651 (S.C. 1960). "The fact finder is to look for mutual assent: the intent of each party to be married to the other and a mutual understanding of each party's intent." Callen v. Callen, 620 S.E.2d 59, 62 (S.C. 2005). "Consideration is the participation in the marriage." Id. "If these factual elements are present, then the court should find as a matter of law that a common-law marriage exists." Id.

12. Direct evidence of the requisite intent, such as a public declaration that the couple is entering into a contract of marriage, however, may not be readily available. See Johnson, 112 S.E.2d at 652 (The facts "evidencing a mutual agreement to live together as husband and wife, and not in concubinage . . . are often difficult of ascertainment where the intent of the parties has not been formally and publicly declared.") (citation omitted). Thus, the existence of a common-law marriage frequently is proved by circumstantial evidence. The circumstantial evidence

---

[5] This requirement includes being at least sixteen (16) years of age, not being married to someone else, and not being too close a relation to the other party. See S.C. Code Ann. §§ 20-1-10 & -100 (2000). The court is unaware of any contention by Nationwide that Motsinger and/or Workman did not have the capacity to marry.

typically relied upon to establish a common-law marriage includes evidence establishing that the parties have lived together for an extended period of time and have publicly held themselves out as husband and wife. See, e.g., Kirby, 241 S.E.2d at 417 (finding common-law marriage where parties represented themselves as husband and wife in their community, filed joint income tax returns, and appeared as husband and wife on children's birth certificates); Owens v. Owens, 466 S.E.2d 373, 375 (S.C. Ct. App. 1996) (finding common-law marriage where, inter alia, parties held themselves out as husband and wife, and entered into contracts and opened checking account as husband and wife); cf. Cathcart v. Cathcart, 414 S.E.2d 811, 812 (S.C. Ct. App. 1992) (finding no common-law marriage where parties testified they did not intend to be married to each other, and parties did not refer to each other as husband and wife, did not file joint tax returns, and did not receive mail at the same address).

13.     "[W]hen the proponent [of a common law marriage] proves that the parties participated in 'apparently matrimonial' co-habitation, and that while cohabiting the parties had a reputation in the community as being married, a rebuttable presumption arises that a common-law marriage was created." Callen, 620 S.E.2d at 62 (citing Jeanes v. Jeanes, 177 S.E.2d 537, 539-40 (S.C. 1970)). "This presumption may be overcome by 'strong, cogent' evidence that the parties in fact never agreed to marry." Id. (citing Jeanes, 177 S.E.2d at 540). However, this presumption "in no way lessens the claimant's burden of proving a common-law marriage by the preponderance of the evidence." Barker v. Baker, 499 S.E.2d 503, 507 (S.C. Ct. App. 1998). "Instead, the presumption simply designates that, if proven to the satisfaction of the fact-finder, will be sufficient to establish a common-law marriage unless properly rebutted" with strong, cogent evidence. Id.

14.     "A party need not understand every nuance of marriage or divorce law, but he

13

must at least know that his actions will render him married as that word is commonly understood." Callen, 620 S.E.2d at 63. "If a party does not comprehend that his 'intentions and actions' will bind him in a 'legally binding marital relationship,' then he lacks intent to be married." Id. "A lack of intent to be married overrides the presumption of marriage that arises from cohabitation and reputation." Id. "South Carolina does not impose marriage upon a couple merely because they intend to be together forever." Id. (citation omitted).

Other Relevant Law

15. South Carolina law requires a couple to obtain a marriage license in order to have a legally binding wedding ceremony. S.C. Code Ann. § 20-1-210 (1999).

16. The Horry County (South Carolina) Probate Court will only perform a marriage ceremony if requested by the marital applicants. Horry County Probate Court, www.horrycounty.org/portals/0/docs/probatecourt/mrg_lic_instr.pdf (last visited Nov. 25, 2013).

17. Under Federal law, the filing status of head of household is unavailable to individuals that are married. IRS, http://www.irs.gov/publications/p504/ar02.html (last visited Nov. 25, 2013) ("You may be able to file as head of household if you meet all the following requirements. You are unmarried or 'considered unmarried' on the last day of the year.")

18. Since 1958, the Internal Revenue Service ("IRS") has recognized common law marriage, taking the position that a couple would be treated as married for purposes of federal income tax filing status and personal exemptions if the couple entered into a common-law marriage in a state that recognizes that relationship as a valid marriage. I.R.S. Rev. Rul. 58-66, 1958-1 C.B. 60 (1958) ("[I]f applicable state law recognizes common-law marriages, the status of individuals living in such relationship that the state would treat them as husband and wife is,

for Federal income tax purposes, that of husband and wife.").[6]

19. The vacated September 2, 2010 order of the Horry County (South Carolina) Family Court, finding that Motsinger and Workman were married by common law dating back to November 9, 2007, does not have any effect on this matter. See Bryan v. BellSouth Commc'ns, Inc., 492 F.3d 231, 240 (4th Cir. 2007) ("The vacating of an order deprives the order of any effect."); see also United States v. Martin, 378 F.3d 353, 358 (4th Cir. 2004) (explaining that vacate "means to render an act void; as, to vacate an entry of record, or a judgment") (internal quotation marks and alteration omitted).

The Court's Analysis

20. The court finds that it has been presented with evidence in this matter that differentiates this case from the common law marriage case law cited by the parties. More specifically, this matter involves the unique situation wherein the alleged common law husband and wife agree that they are in a common law marriage, and a third party is asserting that they are not.

21. The court finds that a strong presumption was created that Motsinger and Workman were common law married on November 10, 2008, based on testimony and other evidence showing that Motsinger and Workman started cohabitating in mid-2007, reached an apparent agreement to be married and exchanged wedding rings in November 2007, and held themselves out as married to friends thereafter. (See, e.g., Motsinger Bench Trial Test.; Workman Bench Trial Test.; J. Huffman Bench Trial Test.)

---

[6] Revenue rulings are used by the IRS to show the application of the law to specific facts presented by taxpayers. See Drake Law, http://libguides.law.drake.edu/content.php?pid= 80349&sid=651590 (last visited Nov. 25, 2013). Revenue rulings are less authoritative than regulations, but do have precedential value. (Id.) Revenue rulings are assigned numbers chronologically by year in this format YY-## (up to 2000) or YYYY-## (2000 and later). (Id.) Therefore, Revenue Ruling 58-66, 1958-1 C.B. 60 was issued in 1958.

22. The court further finds that the strong presumption of common law marriage was rebutted with strong, cogent evidence showing the lack of intent by Motsinger and Workman to be common law married. At the time of their automobile accident, Motsinger and Workman did not jointly own any financial accounts or property, nor were they listed on each other's respective automobile insurance policies. (Motsinger Bench Trial Test.) In relation to her post-accident treatment, Motsinger filled out important medical forms in which she unequivocally stated that she was either single or engaged and at no point did she reference Workman as her spouse, despite having numerous opportunities to do so. (Def.'s Bench Trial Exs. 12-17, 21, 22, 24.) Motsinger and Workman both indicated under penalty of perjury that they were not married on various tax returns before and after the November 10, 2008 accident. (Def.'s Bench Trial Exs. 3-6.) Moreover, the testimony presented at the bench trial never pinpointed the specific date that Motsinger and Workman were common law married, vacillating between June of 2007, November 9, 2007, and November 16, 2007. (See, e.g., J. Motsinger Bench Trial Test.; Workman Bench Trial Test.; J. Huffman Bench Trial Test.) Based on the foregoing, the court finds that Motsinger and Workman's non-marital representations were of greater weight and credibility than their marital representations.

23. Finally, the court finds that Motsinger and Workman's explanations for their non-marital representations are not persuasive. Motsinger testified that she and Workman did not legally bind themselves by way of a marriage license because she did not want to be married in an impersonal way in front of a judge. (Motsinger Bench Trial Test.) Motsinger's reasoning is unpersuasive because the act of obtaining a marriage license would not have required Motsinger and Workman to be married in front of a judge. Motsinger and Workman further asserted that whenever they held themselves out as single, it was because they feared their common law

marriage would not be accepted. (Motsinger Bench Trial Test.; Workman Bench Trial Test.) This assertion is also unpersuasive because common law marriage is an accepted practice in the State of South Carolina (and by the IRS for that matter), such that the failure by Motsinger and Workman to identify and/or defend their marriage on medical forms and tax documents is evidence of a lack of intent to be married.

24.     Therefore, based upon a preponderance of the evidence, the court finds that Motsinger, because she was not Workman's common law spouse on the date of their accident, is a Class II insured and is not entitled to stack the UIM coverage of the four vehicles insured by Nationwide under policy numbers 61 39 K 808483 and 61 39 M 030427.

## CONCLUSION

For the foregoing reasons, the court declares that Carlotta Motsinger was a Class II insured on November 10, 2008, because she was not common law married to William Workman on that date. As a result, the court further declares that Carlotta Motsinger is not entitled to stack the UIM coverage of the four vehicles insured by Nationwide under policy numbers 61 39 K 808483 and 61 39 M 030427. Accordingly, Carlotta Motsinger's motion for directed verdict on Nationwide's counterclaim is **DENIED**. (ECF No. 148.)

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

November 25, 2013
Florence, South Carolina